PEOPLE, PLAINTIFF AND APPELLEE, *v.* VALDÉS, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Guayama in a Prosecution for Malicious Mischief.

No. 885—Decided April 14, 1916.

MALICIOUS MISCHIEF—MALICE—TRESPASSING ANIMALS—CRIMINAL ACT.—Whatever may be the kind or degree of malice necessary to constitute the crime of malicious mischief under section 514 of the Penal Code, its existence may be negatived always by proper proof of other motives, and the motive with which a person kills or injures a trespassing animal is the test of the criminality of the act.

ID.—ID.—TRESPASSING ANIMALS.—A single and simple trespass of an animal, causing some slight damage to property, unaccompanied by any other act, is not of itself sufficient to negative a *prima facie* showing of malice.

ID.—TRESPASSING ANIMALS—PROTECTION OF PROPERTY.—When the evidence shows that the animals were constantly trespassing upon the property where they were finally killed; that they were destroying plants worth much more than the said animals; that they were driven out of one place only to enter immediately at another; that the owner of the animals was repeatedly requested to remove them from the property and answered that they were not his and might be killed, and that the killing of the animals was necessary to protect the property, the crime of malicious mischief is not committed.

ID.—MUNICIPAL ORDINANCE—IMPOUNDING STRAY ANIMALS—PRESUMPTION—JUDICIAL NOTICE.—When in a prosecution for the killing of an animal there is no intimation in the record that the question of whether the defendant should have captured and impounded the animal instead of killing it, in view of the existence of ordinances in the municipalities providing for the impounding of stray animals and the punishment by fine of the owners thereof, was raised or considered by the court *a quo*, this court cannot presume the existence of such ordinances although the lower court may have taken judicial notice thereof at the trial.

ID.—MALICE—ORDERS OF EMPLOYER.—Where the defendant killed an animal without malice and with no other motive than the protection of the property under his care, in compliance with the express orders of his employer given after every other reasonable means of protecting the growing crops had been exhausted without avail and only when patience had ceased to be a virtue, he should be acquitted.

The facts are stated in the opinion.

*Mr. José C. Ramos* for the appellant.

*Mr. Salvador Mestre, fiscal,* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Defendant, appellant, was convicted of malicious mischief under section 514 of the Penal Code, which reads as follows:

"Every person who maliciously kills, maims, or wounds an animal, the property of another, or who maliciously and cruelly beats, tortures or injures any animal, whether belonging to himself or another, is guilty of misdemeanor."

The testimony, in so far as it tends to show the existence or non-existence of malice, the only question involved herein, is in substance as follows:

ROGELIO PÉREZ, who made the complaint, says: "That while witness was in the yard of his house looking towards the west, he saw the defendant firing a gun and thinking that defendant had shot some of his goats ran to the spot of the occurrence. On arriving there defendant said: 'I killed the goats because they were in the property and I have orders from Domingo Mundo, the owner of the place, to kill any goat that comes here.' We had these goats tied at the bank of the river, but it seems that the she-goat broke the rope and got loose and on passing the dividing line between the property of Mundo and the river the defendant shot and killed them. There were no plantations at the place where the goats were killed." On cross-examination: "That he saw the defendant when he fired but did not see the spot where the goats were at that moment, as this was in the opposite direction; that he had the goats tied in the river; that the matter involves a she-goat and her kid and witness only knows that the goat was tied and got loose, and witness saw

defendant when he fired, but witness does not know where the goat was; and later he saw the she-goat dead at the boundary.''

MAXIMILIANO CASTRO testified: ''That on the day of the incident and while witness was at the river he heard a shot and then he went towards the place whence the sound came, seeing there a she-goat and her kid dead, the goat lying outside the fence and the kid within the property of Domingo Mundo near the fence. Almost at the moment witness reached the spot the defendant, who was the watchman on the property of Domingo Mundo, came saying he had killed the she-goat and her kid.'' On cross-examination: ''That he heard only one shot and he, the witness, was near the place of the incident; that at the place where the kid was found dead there was some sugar cane planted.'' Questioned by the judge he answered: ''That the fence placed at the boundary of Mundo is of wire of about two or three strands; that the she-goat could pass under the wire.'' Upon re-direct examination: ''That the kid was about two or three months old and the she-goat was carrying a piece of rope hanging.''

RAFAEL C. ATILANO states: ''That the day referred to in the complaint witness was near the defendant at a distance of about a hundred meters and saw a she-goat with her kids going up a little hill; at the same time he saw the defendant who shot and killed them, the animals being the property of Rogelio Pérez.''

For the defense, DOMINGO MUNDO testified: ''That he knows defendant Bartolo Valdés, who during the month of May of the year 1913 was a watchman on the property of witness; that the day referred to in the complaint witness went out to make the rounds of his property as was his custom and in passing by the river opposite a piece of cane called 'The Cemetery' he saw the she-goat there with her kid; that he then went to the house of a tenant looking for the watchman and asked the tenant about the watchman; that the tenant answered: 'He has just gone there to see

some goats that are in the cemetery piece;' that the witness went and saw that the watchman was in fact entering the piece of cane and he fired, and then witness saw a she-goat jump over the bank and fall at the river's edge, and that the kid dropped dead on the spot; that these goats were always constantly penetrating his property, being put out at one place and entering at another because complainant had no pasture for them; at night he had them in his house and during the day put them at the edge of the river among stones where there is no grass, and naturally the goats went into the piece of cane which, being under irrigation, was like lettuce, and were destroying it. Witness called the attention of the complainant several times to the damage these goats were doing and he would answer: 'Those goats are not mine; if you find them there kill them, because, as I said before, they are not mine.' Then I thought that in order to save and protect my cane it was necessary to kill them; if they belonged to nobody they would be mine, and, with the purpose of protecting my planting, I gave orders to the watchman to kill them, inasmuch as the value of the goats was nothing in comparison with the hundreds of dollars represented by the cane, and considering that the moment a goat touches a stalk of cane it dies. The river mentioned is dry and only its bed crosses my property which bounds the same on both sides." On cross-examination: "That he was a *cuerda* away from the place where the goats were and could see perfectly, as the cane was small; that it was the she-goat that fell in the river and the kid that fell dead on the spot; that witness was tired of going to see the complainant and said to him: 'You must see that your goats are destroying my cane and those plantings cost me a great deal of money; the goat eats the cane and it dies.' He said: 'Well, they are not mine, my goats are tied.' That all other persons having goats around there keep them tied and some of them, when one gets loose, catch it at once; that the goats came along the river's edge and were eating the rows of cane;

that the fence has two strands of wire and witness cannot put more because when the river rises it carries the same away; that in the country the custom is to put two or three strands of wire."

ANTONIO PATIÑO says: "That on the day after the killing of the goat mentioned in the complaint witness was called as an insular policeman to go and see the damage said animals had caused in the property of Domingo Mundo; that they entered at the spot and witness saw a stalk of cane which showed that it had been bitten by a goat or other animal and near the same there was a blood stain." On cross-examination he stated: "That there was only one small plant cut through the stalk; that the other stalks which had been cut showed signs of age as the ends were already dried."

BARTOLO VALDÉS, the defendant, states: "That on the day referred to in the complaint he was at the house of Carlos Soliveras talking with him when his wife called from the other side of the river: 'Bartolo, look at the goats, they are in the cane.' Immediately the defendant ran to the piece of cane and saw the goats within the same. As he took aim his employer, Domingo Mundo, appeared and then the defendant at one shot killed the two goats that were in the piece of cane; the big one went over the bank and the small one remained on the spot. Neither Maximiliano Castro, Rafael Atilano nor the complainant were there. They passed through the property of Atilano coming out at the place where defendant killed the goats. These animals had frequently come into the property and caused damage. He was tired of notifying the owner of the goats, the mother of complainant; that he had been employed for three months and almost every day said to Carolina: 'Take care of the goats; they are causing damage in the property of Domingo Mundo,' and she answered: 'I have no goats, and if you find them in the cane kill them;' that he came that day and found the goats of Carolina in the piece of cane and killed them because he had orders to that effect from Domingo Mundo."

Under the facts thus shown, we may put aside at the outset all question of civil responsibility for the admitted act of defendant, however unwarranted and inexcusable the same may be, if viewed as a mere tort, as well as the question of whether actual malice is necessary to commit the offense, or whether constructive malice is enough, and, *a fortiori,* the further question as to whether in either event such malice must be directed as against the owner of the property injured, or whether malice against the property itself will suffice. 8 R. C. L. 299, sections 323 *et seq.;* 3 C. J. 166, sections 545 *et seq.;* Bishop on Statutory Crimes, p. 388, sections 432–*e et seq.;* 19 L. R. A. (N. S.) 273, case note; 32 Amer. Dec. 662, note.

Whatever the kind or degree of malice required to constitute the crime, the existence thereof may be negatived always by proper proof of other motives and "The motive with which one kills or injures a trespassing animal is the test of the criminality of the act." 1 Wharton, Criminal Law, p. 205, section 159; II *id.* p. 1535, section 1322, p. 1551, section 1345; Bishop, Statutory Crime, p. 392, section 437; 8 R. C. L. 303, section 327.

Most, if not all, of the conflicting cases may be largely reconciled in so far as the true underlying principle is concerned, if the facts involved in each particular instance be carefully measured by the rule last mentioned.

Thus in the case of *Snap* v. *People,* 19 Ill. 80, cited by the *fiscal* and perhaps more often than any other referred to as sustaining the too broadly stated proposition that "The injuring or wounding of trespassing animals cannot be justified on the ground that they were doing damage at the time," 8 R. C. L., p. 303, section 327, we find that all the evidence in the case is summed up by the court in two short sentences as follows:

"The proof showed that Snap, by the direction of Francis, shot the mare with fine shot, inflicting a wound upon her flank, from which she recovered. The mare, at the time, was trespassing in a

field of oats belonging to one of the plaintiffs in error, which was protected by an insufficient fence.''

There is not the remotest suggestion of any previous trespass by the mare, nor of any reason to anticipate a repetition thereof, nor of any circumstance whatever to show that the act of defendant was in anywise necessary to the protection of his property. On the contrary, the use of fine shot suggests a spirit of wanton cruelty, malignity, hostility and revenge, and the meager facts disclosed by the decision as reported, in the total absence of any mitigating circumstances beyond the bare trespass itself, ''bespeak a mind prompt and disposed to the commission of mischief'' rather than an honest purpose upon the part of defendant to defend his growing crops from the ravages of a persistently destructive, breachy or vicious animal by a resort to the only adequate and effective means of abating such a nuisance. The case can hardly be interpreted, therefore, as establishing anything more than the proposition that a single naked trespass accompanied by some slight damage to property by the offending animal is not, alone and unaided by any other fact, sufficient to negative a *prima facie* showing of malice. See also *State* v. *Grimes*, 13 S. W. 955.

In *State* v. *Murphy*, 68 S. E. 570:

''There was testimony that the defendant had been annoyed by the hogs of his neighbors trespassing upon his premises, and he had given them notice to remove them. The prosecutor testified that defendant told him a few days before the hog was shot that he was going over there with his gun and shoot everything he found there, that he was going over to shoot hogs; that he was going to kill every damned thing that came there. Defendant admitted killing the hog.''

The exceptions questioned the ruling of the trial judge, among others, ''in refusing a new trial after he had charged the jury that it was a good defense to the indictment to show that the killing was done while the animal was trespassing within the defendant's inclosure, and with the motive

of protecting his property from its depredations, when the testimony showed that those were the circumstances under which the hog was killed," and the court, referring to this point, said:

"Without expressing any opinion as to the correctness of the charge that it was a good defense to the indictment to show that the killing was done while the animal was trespassing within defendant's inclosure, and with the motive of protecting his property from its depredations, as the correctness of that proposition is not before the court, we see no error in refusing the new trial after the court had so charged, because the jury evidently found that the protection of defendant's property was not the sole motive for the killing of the hog, but that it was done maliciously. That finding having support in the evidence, the ruling of the circuit judge on the motion for new trial cannot be reviewed by this court.

"The motion for a new trial was based upon alleged erroneous findings of fact by the jury. In response, his honor said the jury knew the neighborhood and people better than he did, and, presumably, for that reason, he thought their findings were correct, at least, he assigned that as one reason for his refusal to disturb the verdict. That was a good and sufficient reason."

*Stephens* v. *State,* 8 Amer. Crim. Rep. 157, in which defendant was convicted of cruelty to animals, is a case somewhat more analogous upon the facts to the case at bar:

"The testimony shows that a neighbor's hogs got into Stephens' crop; that Stephens went to the owner of the hogs, who assisted him in getting them out of his field; that the hogs broke into his field again, when he again went to their owner and asked his assistance in getting them out, but the owner refused to do so. Stephens then tried to get the hogs out; but, after running them for some time and failing to get them out, he got his gun and killed several of the hogs. On the trial he offered to prove that he had a lawful fence around his field, which the court refused. He then asked the court to instruct the jury that if the evidence showed that he killed the hogs to protect his crop, etc., and not out of a spirit of cruelty to the hogs, they should acquit him. The court refused this instruction, judgment was rendered against him, and he appeals."

The Supreme Court of Mississippi, without hesitation and,

we think, correctly, applies the fundamental principle involved as follows:

"It was error.for the court below to refuse to instruct the jury for appellant, to the effect that they should find him not guilty, if they believed from the evidence that he killed the hogs while they were depredating on his crop, and to protect it from destruction, and not out of a spirit of cruelty to the animals. Such instruction was applicable to the evidence, and expounded the law correctly. It was immaterial whether appellant had a lawful fence or not. The motive with which the act was done is the test as to whether it was criminal or not. Unless appellant was actuated by a spirit of cruelty, or a disposition to inflict unnecessary pain and suffering on the animals, he was not guilty of the offense charged. He may have committed a trespass for which he is liable in a civil suit, but if his purpose and intent was to protect his crop from depredation, he did not violate the statute under which he was indicted."

In *Hobson* v. *State,* 44 Ala. 380 (note, 128 Amer. St. Rep. 164) it was held that "If on a trial for malicious mischief in killing a hog, the jury believe that the defendant acted under instructions from his employer, and that he believed that he had a right to kill the animal in pursuance of such instructions, and that he had no malice toward the owner of the animal, he should be acquitted." See also *People* v. *Kane,* 29 N. E. 1014, 37 N. E. 104; *Brady* v. *State,* 26 S. W. 621.

In *Lott* v. *State,* 9 Texas Court of Appeals 206, mentioned in 47 Amer. Rep. 310, note, an indictment for unlawfully wounding a hog, the court said:

"We think however that the court erred in refusing to permit the defendant to show by the witness Reeves 'that the hog was in the habit, and had for a considerable length of time, been in the habit of trespassing upon defendant's property, in and about his mill and premises, destroying the same and greatly annoying and damaging defendant;' and that as soon as defendant killed the hog he immediately sent the value of it in money to the owner, and paid him for it. This evidence should have gone to the jury that they might have considered it in determining whether the killing was wilfully and wantonly done, without excuse, and under circumstances

evincing a lawless spirit, or whether under the circumstances such facts negatived such prompting, motives, and wantonness. *Branch* v. *State,* 41 Tex. 622; *Jones* v. *State,* 3 Tex. Ct. App. 228.''

In the same note will be found a more elaborate statement of another very interesting case, *Thomas* v. *State,* 14 Texas Court of Appeals 200, in which the same principle is applied to somewhat different facts. See also *Wright* v. *State,* 76 Amer. Dec. 656; *Farmer* v. *State,* 2 S. W. 767; *State* v. *Churchill,* 98 Pac. 854.

In the case at bar the evidence is uncontradicted that the prosecutor kept his goats tied, when tied at all, in the stony bed of a dry ravine; that they were constantly depredating upon the premises where they were finally killed; that they were destroying property out of all proportion to their own value; that as fast as they were driven out at one point they invariably and forthwith re-entered at another; that both the owner and his mother had been repeatedly warned to keep them out of the cane field and had as often replied that the trespassing animals were not their goats, that their goats were tied, and that they even told the owner of the cane field and his watchman, the defendant, if they found the goats there, to kill them. The piece of rope dangling from the neck of the mother goat bears eloquent testimony to the tensile strength of her tether just as the statements of the defendant and his employer are not only not denied by the owner of the goats, but, on the contrary, are strongly corroborated by his own naive confession of the instantaneous conclusion reached by him upon hearing the shot as to the true identity of the invisible target and by the unerring accuracy of that shrewd intuitive judgment which sent him running, not to the spot where his goats had been tied, but directly to the scene of slaughter.

We need not notice in detail the contention of the *fiscal* that inasmuch as ordinances exist in all the municipalities providing for the impounding of stray animals and for the punishment by fine of the owners thereof, defendant should

have captured and impounded the goats instead of shoot-
ing them, and that his election of the alternative last men-
tioned indicated malice. In the total absence of any inti-
mation in the record that any such question was raised or
considered at all by either of the trial courts, we cannot as-
sume the existence of such an ordinance, although the munici-
pal or even the district court on a trial *de novo* might have
taken judicial knowledge thereof had it existed, and we there-
fore do not decide at this time how far such an ordinance,
had it appeared from the record to exist or to have influ-
enced the court below, would have affected the decision of
this appeal.

In so far as the facts are disclosed by the record, defend-
ant acted in the best of faith, without any malice whatsoever,
either actual or constructive, and with no other motive than
the protection of the property which he was employed to
guard by carrying out the express orders of his employer,
given after every other reasonable means of protecting the
growing crops had been exhausted without avail and only
when patience had ceased to be a virtue.

The judgment appealed from must be

*Reversed.*

Chief Justice Hernández and Justices Wolf and Aldrey
concurred.

Mr. Justice del Toro took no part in the decision of this
case.